NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2026 VT 34

No. 25-AP-406

| | |
|---|---|
| Scott Wakefield | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orange Unit, |
| | Family Division |
| | |
| Erin Wakefield | June Term, 2026 |

Daniel P. Richardson, J.

Charles S. Martin of Martin, Delaney & Ricci Law Group, Barre, for Plaintiff-Appellant.

Rory N. Butler of Lynn, Lynn, Blackman & Toohey, P.C., Burlington, for Defendant-Appellee.

PRESENT: Reiber, C.J., Eaton, Waples, Nolan and Drescher, JJ.

¶ 1. **EATON, J.** This appeal involves the enforceability of a premarital agreement between husband, Scott Wakefield, and wife, Erin Wakefield. Husband appeals the family division's holding that a provision of the premarital agreement allocating a farmhouse to husband was unenforceable. The family division determined that the provision was unconscionable at the time of the agreement's formation and, in the alternative, that husband constructively abandoned the provision through his estate plan. It therefore awarded wife a share of the farmhouse's value in its final divorce order. We reverse and remand.

¶ 2. Unless otherwise noted, the following facts relevant to the issues on appeal are drawn from the family division's findings. The parties began dating in May 2016 and were married on July 15, 2017. At the time of their marriage, wife was employed as a full-time special-education

schoolteacher, and husband worked as a co-owner and primary operator of his family's dairy farm in Brookfield, Vermont. Husband was the eighth generation of his family to farm the land on the property in Brookfield. The farm was divided into various legal entities for business and tax purposes. Prior to the marriage, husband owned and lived in the farmhouse located directly across the road from the farm property and its dairy operations.

¶ 3.    A little over a week before their marriage, the parties entered into a premarital agreement. The agreement[1] began with statements of intent, including that both "parties desire to have" each spouse "keep all of his [or her] separate property acquired prior to . . . the forthcoming marriage and to have" each "retain any and all real and personal property that he [or she] now has, free from any claim of" the other "by virtue of the forthcoming marriage." The agreement defined each party's "separate property" as "[a]ll of [the party's] right, title and interest, legal or beneficial in and to all the property, real and personal, and any interests therein acquired prior to the forthcoming marriage as listed" in the schedule attached to the agreement.[2]

¶ 4.    The agreement provided that "husband shall . . . retain the sole ownership of all of husband's separate property . . . and shall have the exclusive right to dispose of any and all such husband's separate property during his remaining lifetime, by inter vivos or testamentary transfer." The agreement also stated that "wife hereby waives, relinquishes and releases all right, title and interest in and to any and all of husband's separate property . . . in which wife may otherwise be

---

[1]    In this opinion, quotations from this agreement include nonsubstantive alterations to capitalization for readability.

[2]    The agreement included numerous identical provisions: one focusing on "husband" or "husband's separate property" and the other focusing on "wife" or "wife's separate property." The remaining quoted portions of the premarital agreement will include only those provisions related to husband's separate property, as those provisions are relevant to the issues on appeal.

2

entitled as husband's wife . . . upon or by virtue of a termination of the forthcoming marriage of the parties by . . . divorce."[3]

¶ 5.     In the event of a divorce, the agreement stated that "wife releases any and all claim against husband's separate property, including . . . property settlement [and] equitable distribution" and that "husband's separate property shall not be considered in making any such determinations."  The agreement further stated that "wife and husband each agree that neither wife's separate property nor husband's separate property or debt shall be considered in determining a property settlement pursuant to 15 V.S.A. [§] 751 . . . but instead each party's separate property . . . shall be specifically allocated to each."  According to the agreement, in the event of a divorce, "husband's sole obligation to wife . . . shall be to divide equally between themselves any jointly held bank or brokerage accounts."

¶ 6.     The agreement specified that "[e]ither party shall have the right to voluntarily transfer or convey to the other to be held solely in their name any property or interest therein which may be lawfully conveyed or transferred during his or her lifetime, or by will or otherwise upon death" and that "[a]ll voluntary transfers or conveyances shall be deemed to be a voluntary gift from the transferor to the transferee and shall not in any way be deemed a waiver or abandonment of this agreement or any part hereof."  The agreement also provided that in the event that husband or wife "predecease[d] the other, the surviving spouse shall be entitled to reside in the then primary residence for a period of up to twelve (12) months following the spouse's death, subject to the

---

[3] In addition, in this separate section specifically labeled, "Waiver by Wife," the agreement went on to state that "wife agrees that husband's separate property shall be excluded from any computation of alimony, support or division of assets for the benefit of wife" and that "husband's separate property shall specifically be allocated to husband with no equalizing allocation to wife." The waiver provision further stated that "wife specifically waives any claims or rights to husband's separate property she may have or may acquire pursuant to the property settlement provisions of 15 V.S.A. [§] 751" and that she "agrees that husband's separate property shall be specifically allocated to him with no equalizing allocation to wife as to the value of husband's separate property."

surviving spouse paying all costs of prorated maintenance, insurance and property taxes on said primary residence."

¶ 7.     Attached to the agreement were lists of husband's and wife's respective property at the time they signed the premarital agreement. Husband's list included "Farm Real Estate" valued at $426,832. The family division determined and both parties agree that this list sufficiently identified the farmhouse as husband's separate property for purposes of the agreement.

¶ 8.     Husband signed a will on the same day the parties signed the premarital agreement. Husband's will included a provision that gave wife a life estate in the farmhouse. The relevant provision stated that, if husband was married to wife at the time of his death, wife would receive "a life estate in our house and two acres subject to [wife] being responsible for the ongoing property taxes, insurance, and utilities on the house portion of such obligation."

¶ 9.     The parties used the farmhouse as their primary residence during their marriage and had three children together. They separated in the spring of 2023, and husband filed for divorce in the family division in September 2023.

¶ 10.    During the proceedings before the family division, husband moved for enforcement of the premarital agreement. Wife opposed the motion and challenged the agreement's enforceability on three bases. She asserted that: (1) the agreement was invalid because she had entered the agreement under duress, (2) the agreement was unconscionable at the time of execution, and (3) if enforced, the agreement would leave her a public charge and barely above federal poverty guidelines.

¶ 11.    The family division conducted a two-day evidentiary hearing on the premarital agreement. In an extensive opinion, the court determined that the parties were familiar with each other's employment and respective financial situations prior to entering into the premarital agreement. The parties were also adequately represented by attorneys and made fair disclosures of their finances as part of the agreement-drafting process. Both parties entered into the agreement

4

voluntarily and without physical compulsion or improper threat despite wife's initial unwillingness due to her religious beliefs. The court therefore concluded that the premarital agreement was enforceable except for the provisions related to the farmhouse. The court found that those provisions were unconscionable; alternatively, it found that husband had constructively abandoned them by treating the farmhouse as a joint asset. Accordingly, it held that the farmhouse was a marital asset for purposes of 15 V.S.A. § 751.[4]

¶ 12. Following a subsequent final contested hearing, the family division awarded husband ownership of the farmhouse but required husband to pay one-third of the farmhouse's equity—$106,000—to wife within 180 days. The court ordered that if husband could not make the payment within the time allotted, wife could file a motion with the court to order a sale of the farmhouse and that, in such a circumstance, she would be entitled to $106,000 and interest from the net proceeds. This appeal followed.

¶ 13. Husband makes the following arguments on appeal. First, husband argues that the premarital agreement is enforceable against wife as to the farmhouse. According to husband, the family division erred in its unconscionability analysis and incorrectly concluded that husband had constructively abandoned the provisions allocating the farmhouse to husband. Second, husband argues that the family division abused its discretion in failing to consider the impact of the sale of the farmhouse on husband and the children. We address each argument in turn.

I. Unconscionability

¶ 14. We interpret premarital agreements "according to rules for construing a contract." Gamache v. Smurro, 2006 VT 67, ¶ 7, 180 Vt. 113, 904 A.2d 91. "[T]he construction and

---

[4] The family division made no factual findings regarding whether enforcement of the agreement would make wife a public charge—instead, it merely summarized the relevant testimony and arguments made by each party. See Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967) ("A recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed."). The court also made no legal conclusions concerning whether the premarital agreement was against public policy for this reason.

interpretation of a contract, including whether a contract is ambiguous or unconscionable, are questions of law, which we review de novo." Falcao v. Richardson, 2024 VT 78, ¶ 11, 220 Vt. 310, 329 A.3d 208; see also Lacroix v. Rysz, 2025 VT 16, ¶ 13, __ Vt. __, 336 A.3d 321 (applying contract principles outlined in Falcao, 2024 VT 78, ¶ 16, to premarital agreement).

¶ 15.    Under our established precedent in Bassler v. Bassler, 156 Vt. 353, 361, 593 A.2d 82, 87 (1991), which we recently reaffirmed in Lacroix v. Rysz, a premarital agreement is enforceable if, at the time of formation:

> (1) each spouse has made fair and reasonable disclosure to the other of [the spouse's] financial status, (2) each spouse has entered into the agreement voluntarily and freely, (3) the substantive provisions of the agreement dividing the property upon divorce are fair to each spouse, and (4) the agreement is not "unconscionable."

Lacroix, 2025 VT 16, ¶ 12 (quoting Bassler, 156 Vt. at 361, 593 A.2d at 87).

¶ 16.    "[W]hether a contract is unconscionable may turn on substantive fairness of terms or factors relevant to formation of a contract." Id. ¶ 13 (quotation omitted). Unconscionability is generally "measured based on the circumstances at the time the agreement is entered." Id. Black's Law Dictionary defines "unconscionable" generally to mean "[s]hockingly unjust or unfair"; in relation to an act or transaction, "unconscionable" means "showing no regard for conscience" and "affronting the sense of justice, decency, or reasonableness." Unconscionable, Black's Law Dictionary (12th ed. 2024). In Stalb v. Stalb, we explained that under the traditional standard of unconscionability, "[an] agreement will not be enforced if it shocks the conscience and confounds the judgment of any man of common sense, or if no person in his or her senses would make it and no honest and fair person would accept it." 168 Vt. 235, 242, 719 A.2d 421, 426 (1998) (citation omitted) (applying New York common law, under which "[premarital] agreement provisions on distribution of property may be reviewed only under traditional equity standards of unconscionability").

6

¶ 17. In this case, the family division concluded that the premarital agreement was unconscionable as to the farmhouse for three specific reasons. It opined that the provisions allocating the farmhouse to husband did not serve the stated purpose of the agreement, deprived wife of a substantial asset and benefit that she would be entitled to share, and effectively constituted a windfall to husband by allowing him to shield a marital asset that he owned and privately enjoyed.

¶ 18. Contrary to the family division's conclusion, there is nothing under these facts that demonstrates unconscionability at the time of the agreement's formation. As described above, the material provisions of the premarital agreement allocate to each party their own separate property in the event of a divorce. On its face, there is nothing "[s]hockingly unjust or unfair" about a provision that ensures that each party to a marriage retains their separate property following a divorce. Unconscionable, Black's Law Dictionary, supra. Similarly, it cannot be reasonably concluded that "no person in his or her senses would" suggest such a provision or that "no honest and fair person would accept" such a provision. Stalb, 168 Vt. at 242, 719 A.2d at 426. We have recognized that one of the primary goals of premarital agreements is to "to preserve and protect the parties' income and assets upon divorce." Lacroix, 2025 VT 16, ¶ 14 (concluding premarital agreement that left parties in same financial situation as prior to marriage was not unconscionable); see also 5 Williston on Contracts § 11:8 (4th ed. 2026) (indicating one purpose of prenuptial agreement is to protect parties' assets). Thus, "we have previously enforced [premarital] agreements that provided each spouse with the property that the spouse held prior to marriage." Lacroix, 2025 VT 16, ¶ 14. The relevant provision here does exactly that—it protects husband's property upon divorce. Such a provision does not automatically render a premarital agreement unconscionable.

¶ 19. According to the family division, husband sought to enter the premarital agreement for "the classic purpose of protecting the family's dairy business from being divided, encumbered,

7

or otherwise threatened by a divorce proceeding." The family division reasoned that because the farmhouse was not a "necessary part of the farming business," it followed that the provisions allocating the farmhouse to husband were unconscionable because the relevant provisions did not align with husband's purpose to protect his family's business. We disagree.

¶ 20. The "purpose" of a contract is determined by the text of the instrument itself, not testimonial evidence about a party's external motivations for entering the contract. "[W]hen the language of [a] contract is clear on its face, we will assume that the intent of the parties is embedded in its terms." Falcao, 2024 VT 78, ¶ 12 (quotation omitted). In this case, the premarital agreement includes a section describing the parties' intent. The agreement explicitly states that "the parties desire to have husband keep all of his separate property acquired prior to . . . the forthcoming marriage . . . free from any claim of wife." As described in detail above, the agreement also included multiple other provisions to that effect. Considering these provisions both separately and together, the terms of the premarital agreement clearly indicate that the parties intended that each would retain their separate property in the event of a divorce. The agreement does not state that its purpose is to protect the dairy business or only the properties necessary for that business.

¶ 21. Whether husband was motivated to insert the relevant provisions into the agreement to protect only the portions of his family farm directly involved in the dairy operations, or to protect all the properties and legal entities linked to the farm—including the farmhouse—is irrelevant to this analysis because neither purported motivation alters the plain meaning of the term "separate property" in the agreement.[5] See Rock v. Rock, 2023 VT 42, ¶ 28, 218 Vt. 292, 308 A.3d 492 ("When the plain language of the writing is unambiguous, we take the words to represent the parties' intent, and the plain meaning of the language governs our interpretation of the contract."

_____

[5] This reasoning similarly applies to the family division's concern that "[husband] is using the pretext of protecting the family business to shield an asset that would normally be part of the parties' marital estate and that represents a substantial value."

8

(quotation omitted)). The premarital agreement states that each party should retain their separate property, and wife does not contest that the farmhouse is husband's separate property. Thus, the intent of the premarital agreement's scope is clear. Accordingly, we conclude that the family division erred in determining that the agreement's provisions related to the farmhouse were unconscionable for the reason that they did not align with the purpose of the agreement.

¶ 22. The family division also reasoned that the provisions protecting the farmhouse were unconscionable because they "deprived [wife] of a substantial asset[] and benefit that she would be entitled to share." It is true that the premarital agreement removed an asset from the marital estate that wife may otherwise have been entitled to share in the event of divorce under statutory considerations. See 15 V.S.A. § 751(b) (listing relevant factors court may consider in making property settlements, including multiple factors related to family home). However, parties may deviate from statutory rules governing property division when crafting premarital agreements. See Gade v. Gade, 2025 VT 68, ¶ 15, __ Vt. __, 356 A.3d 1044 ("[P]arties to a marriage may enter into enforceable agreements which reflect their desired disposition of marital property in the event of a divorce."). As the family division observed, a premarital agreement is not invalid or unenforceable simply because it places the parties in a position similar to where they were at the beginning of their marriage or distributes property in a way that diverges from 15 V.S.A. § 751. See Lacroix, 2025 VT 16, ¶ 14 ("[A]s long as the agreement does not leave either party a public charge, we have previously enforced [premarital] agreements that provided each spouse with the property that the spouse held prior to marriage.").

¶ 23. Husband and wife were legally capable of entering into an agreement that deviated from statutory considerations by removing the marital home from the marital estate. See id. (holding premarital agreement not unconscionable even though it "bar[red] wife from recovering any significant property award or obtaining spousal maintenance" that she could have obtained absent agreement). Indeed, as explained above, protecting an asset that would otherwise be part

9

of marital property division in divorce is typically the very purpose of a premarital agreement. Id. (explaining "major purpose" of premarital agreements is "to preserve and protect the parties' income and assets upon divorce"). The family division therefore erred in concluding that the agreement was unconscionable on this basis.

¶ 24. The family division further reasoned that the relevant provision was unconscionable because it "effectively constitutes a windfall to [husband] by allowing him to shield a marital asset that he owns and privately enjoys." This conclusion is inconsistent with the family division's findings that husband bought and owned the farmhouse prior to the marriage and that wife was aware of his ownership. The farmhouse was listed as husband's separate property in the premarital agreement. The farmhouse therefore did not constitute "an unexpected, unearned, or sudden gain or advantage" for husband following the divorce. Windfall, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/windfall (last visited July 10, 2026). An individual's private enjoyment of property he or she owned prior to marriage—even if another individual has also enjoyed the property with them for a number of years—does not "shock[] the conscience" or "confound[] the judgment of any man of common sense." Stalb, 168 Vt. at 242, 719 A.2d at 426 (describing unconscionability standard).

¶ 25. While it is true that the parties entered into the premarital agreement with a significant discrepancy in listed assets and debts, the family division did not rely on this as a basis to find unconscionability. It found that the parties had roughly equivalent income at the time they entered the agreement and that the agreement was not unconscionable on the basis of income.[6] We

_____

[6] We note that this Court has also determined that "where, at the time of the divorce, a[] [premarital] agreement leaves one spouse a public charge, or close to it, the agreement may be unenforceable as against public policy." Bassler, 156 Vt. at 361, 593 A.2d at 87; see id. at 362, 593 A.2d at 88 (holding premarital agreement "violate[d] public policy and should not be enforced" where wife was receiving public assistance but husband "always had sufficient means to meet his desires and needs"). As noted above, the family division did not find that the agreement was unenforceable on this basis or make findings that would support such a conclusion.

10

have previously explained that disparate economic outcomes as a result of a premarital agreement—and particularly those that maintain the financial status of each party entering into the agreement—do not render an agreement unconscionable absent other circumstances at the time of divorce. See Lacroix, 2025 VT 16, ¶ 14.

¶ 26. Because none of the reasons cited by the family division support its conclusion that the agreement's provisions concerning the farmhouse were unconscionable, the agreement was enforceable.

## II. Constructive Abandonment

¶ 27. The family division alternatively concluded that husband had constructively abandoned the premarital agreement's provisions as they applied to the farmhouse. We have explained that "as with any other contract, the parties may waive enforcement of certain provisions of a premarital agreement." Rock, 2023 VT 42, ¶ 23. The parties may do so explicitly or implicitly. Id. ¶ 24. "Whether the parties have abandoned an agreement through their conduct is a question of fact for the trial court to decide." Id. ¶ 25. We review the family division's findings of fact on constructive abandonment for clear error and its legal conclusions de novo. See id. (citing Randall v. Hooper, 2020 VT 32, ¶ 6, 212 Vt. 216, 234 A.3d 971)

¶ 28. According to the family division, husband demonstrated an intent to abandon the premarital agreement's provisions concerning the farmhouse by creating provisions in his will and estate planning that would allow wife to remain in the house for the rest of her life if he predeceased her during the marriage. The family division found that husband's estate planning "recogn[ized] that the parties' situation with three children had effectively rendered the house a necessity for the parties," and "marked a shift in how the parties viewed and treated the house" that was "sufficient to remove the property from the agreement to a more traditional analysis of assets under 15 V.S.A. § 751."

11

¶ 29. The family division's finding that husband included the life estate for wife in his will because of the parties' children is clearly contradicted by the record. See Centeno v. Centeno, 2024 VT 30, ¶ 23, 219 Vt. 279, 319 A.3d 706 ("A factual finding is clearly erroneous if it is unsupported by any evidence in the record."). Contrary to the family division's reasoning, "the parties' situation with three children" did not exist at the time husband signed his will. Husband signed his will on the same day as the premarital agreement, prior to the parties' marriage and the birth of any of their three children. Indeed, the will included the following explicit statement: "I do not have any children." For this reason alone, the family division's determination on this issue must be reversed. See Begins v. Begins, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998) (stating this Court will not sustain conclusions "that are not supported by the court's findings" or based on clearly erroneous findings).

¶ 30. Beyond the timing of the husband's execution of his will, the record does not demonstrate that the parties acted in contravention of the agreement during the course of the marriage. Cf. Rock, 2023 VT 42, ¶ 26 (concluding "the parties abandoned the protections of the premarital agreement by acting inconsistently with its terms throughout their long marriage" through clear deviations). The premarital agreement stated that "the parties intend[ed] to reside in Brookfield," the location of the farmhouse, "upon their marriage." The parties acted consistently with this intent by living in and raising their children in the farmhouse; their actions did not indicate any "shift in how the parties viewed and treated the [farm]house."

¶ 31. Furthermore, the timing of the execution of the will and premarital agreement supports the conclusion that the execution of the will did not evince constructive abandonment of the premarital agreement. As described above, the record indicates that the parties signed the premarital agreement and the will within twenty-four hours of each other. Husband testified that discussions about the will were directly relevant to the parties' negotiation concerning the premarital agreement. We have explained that "[i]nstruments executed as part of the same

12

transaction should be read together to discern the intent of the parties." Rounds v. Malletts Bay Club, Inc., 2016 VT 102, ¶ 20, 203 Vt. 473, 157 A.3d 1101; see also Kneebinding, Inc. v. Howell, 2018 VT 101, ¶ 112, 208 Vt. 578, 201 A.3d 326 (explaining "the general rule that when multiple instruments dealing with the same subject matter are executed at the same time by the same parties, the agreements should be construed together" (quotation omitted)). Thus, the execution of the two documents in close temporal proximity and the fact that they include overlapping considerations supports a conclusion that the parties intended that they work in tandem.

¶ 32. Finally, the premarital agreement itself includes a provision indicating that the parties considered the premarital agreement separate from and unaffected by any will. The premarital agreement provides that both husband and wife "have the right to voluntarily transfer or convey to the other to be held solely in their name any property or interest therein which may be lawfully conveyed or transferred during his or her lifetime, or by will or otherwise upon death." The agreement goes on to say that any such transfer "shall be deemed to be a voluntary gift from the transferor to the transferee and shall not in any way be deemed a waiver or abandonment of this agreement or any part hereof." As we have explained, "[w]hen interpreting a premarital agreement, like other contracts, we strive to give effect to the parties' intent as expressed in the language of the agreement," and "[w]hen the plain language of the writing is unambiguous, we take the words to represent the parties' intent, and the plain meaning of the language governs our interpretation of the contract." Rock, 2023 VT 42, ¶ 28 (quotation omitted).

¶ 33. Here, the plain language of the premarital agreement is clear: the parties did not intend for the contemporaneously signed will to be interpreted as modifying or abandoning any aspect of the premarital agreement. Consequently, we hold that the family division erred in concluding that husband constructively abandoned the relevant provisions of the premarital agreement related to the farmhouse, which as described above, are enforceable against wife. We

13

therefore reverse and remand for the court to make a new property division consistent with the terms of the premarital agreement.[7]

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

---

[7] On appeal, husband alternatively argues that the family division abused its discretion in its application of the factors listed in 15 V.S.A. § 751 to the farmhouse. Because we reverse and remand the property division for further proceedings consistent with our holding that allocation of the farmhouse is governed by the premarital agreement, we need not reach this issue.